## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

KEITH D. RICKABAUGH,  :

      Plaintiff,  :

v.  :    Civ. No. 16-225-LPS

NANCY A. BERRYHILL[1]  :
Acting Commissioner of Social Security,  :

      Defendant.  :

---

Oderah C. Nwaeze, DUANE MORRIS LLP, Wilmington, DE

Of Counsel: Eddy Pierre Pierre, LAW OFFICES OF HARRY J. BINDER AND CHARLES E. BINDER, P.C., New York, NY

    Attorneys for Plaintiff

David C. Weiss, Acting United States Attorney, and Heather Benderson, Special Assistant United States Attorney, UNITED STATES ATTORNEY'S OFFICE, Wilmington, DE

Of Counsel: Nora Koch, Acting Regional Chief Counsel, Region III and Margaret Reed, Assistant Regional Counsel, of the Social Security Administration, Philadelphia, PA

    Attorneys for Defendant

## MEMORANDUM OPINION

September 22, 2017
Wilmington, Delaware

---

[1]Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is substituted for former Commissioner Carolyn W. Colvin as defendant in this suit.

*[signature]*

**STARK, U.S. District Judge:**

## I.  INTRODUCTION

Plaintiff Keith Rickabaugh ("Plaintiff" or "Rickabaugh") appeals the decision of

Defendant Nancy A. Berryhill, the Acting Commissioner of Social Security ("Defendant" or "the

Commissioner"), denying his claim for Social Security disability insurance benefits ("DIB") and

supplemental security income ("SSI") under Title II and Title XVI, respectively, of the Social

Security Act, 42 U.S.C. §§ 401-403, 1381-1383f. The Court has jurisdiction pursuant to 42

U.S.C. § 405(g).

Before the Court are the parties' cross-motions for summary judgment. (D.I. 12, 14)

Rickabaugh seeks reversal of the Commissioner's decision or remand to the Commissioner for

proper consideration of the record. (D.I. 13 at 25) The Commissioner requests that the Court

affirm the decision denying Rickabaugh's claim for DIB and SSI. (D.I. 15 at 17)

For the reasons stated below, the Court will deny Plaintiff's motion for summary

judgment and grant Defendant's motion.

## II.  BACKGROUND

### A.  Procedural History

On September, 7, 2010 and September 22, 2010, Rickabaugh filed Title II and Title XVI

applications for DIB and SSI, respectively, alleging disability starting on July 12, 2010. (D.I. 6

("Transcript" and hereinafter "Tr.") at 342, 344) Rickabaugh's claims were denied on December

7, 2010 and again denied upon reconsideration on July 13, 2011. (Tr. at 230, 238) Rickabaugh

then requested a hearing before the Administrative Law Judge ("ALJ"), pursuant to 20 C.F.R.

§ 416.1429. (Tr. at 244) The hearing was held on July 25, 2012, and included testimony from

1

Rickabaugh and a vocational expert ("VE"). (Tr. at 62-63) On August 22, 2012, the ALJ found that Rickabaugh had severe impairments of obesity, mild lumbar spine degenerative disc disease, alcoholism, depression, anxiety, and schizophrenia but was not disabled within the meaning of the Social Security Act and retained residual functional capacity ("RFC") to perform light work. (Tr. at 206, 208) Rickabaugh requested a review of the decision on September 7, 2012, and the Appeals Council remanded the case back to the ALJ on September 12, 2013. (Tr. at 224, 288) Another hearing was held on May 6, 2014, again involving testimony from Rickabaugh and a VE. (Tr. at 104-05) On August 8, 2014, the ALJ issued a decision with the same findings as had been reached after the previous hearing. (Tr. at 37, 43, 45) Rickabaugh requested another review of the decision on September 4, 2014, which was denied on February 4, 2016, making the ALJ's decision the final decision of the Commissioner. (Tr. at 1, 34)

On April 4, 2016, Rickabaugh filed suit in the District of Delaware seeking judicial review of the Commissioner's denial of benefits. (*See* D.I. 1) The parties completed briefing on their cross-motions for summary judgment on November 29, 2016. (*See* D.I. 13, 15)

## B. Factual History

When he applied for DIB and SSI, Rickabaugh was 33 years-old, had experienced the onset of his purported disability at age 32, and was defined as a younger individual under 20 C.F.R. § 416.963. (Tr. at 144) He has a ninth grade education and worked for short periods as a fast food worker, a cashier, a dishwasher, a store laborer/stocker, a pizza deliverer, a laundry laborer, a fork lift driver, an overhead crane operator, and a material handler. (Tr. at 110, 133)

Rickabaugh asserted he is unable to work because of mental illness and a back injury.[2] (Tr. at 41)

### 1.  Mental Health History, Evaluations, and Treatment

On July 22, 2010, Rickabaugh saw Toni Ballas-Rowe, L.C.S.W., for his mental health problems. (Tr. at 474) At the initial visit, Ballas-Rowe observed that Rickabaugh was cooperative; made eye contact; had auditory and visual hallucinations, delusions, impaired concentration and judgment; and appeared anxious, agitated, and paranoid. (Tr. at 478-79) She diagnosed Rickabaugh with paranoid schizophrenia and rated his Global Assessment Functioning ("GAF") score at 30, indicating severe symptoms. (Tr. at 479)

On August 3, 2010, Rickabaugh started seeing nurse practitioner Heather Martin for treatment of his mental illness. (Tr. at 450) She determined that Rickabaugh was alert, cooperative, had normal eye contact, suffered from hallucinations and delusions, and had impaired concentration, judgment, impulse control, memory, and insight. (Tr. at 454) Nurse Martin diagnosed Rickabaugh with paranoid schizophrenia and rated his GAF score at 60, indicating mild to moderate symptoms. (Tr. at 455) She prescribed Zyprexa and Prozac for his schizophrenia. (Tr. at 455)

Rickabaugh continued treatment with Nurse Martin throughout the rest of 2010. (Tr. at 448-49) From September to December 2010, Nurse Martin noted that Rickabaugh experienced fewer auditory and visual hallucinations and that his mood, insight, and judgment gradually improved to an average state. (Tr. at 448) Around the same time, Rickabaugh also continued

---

[2]Rickabaugh does not dispute the ALJ's finding that his back injury does not amount to a disability under the Social Security Act. (Tr. at 43; D.I. 13 at 2 n.4)

meeting with Ballas-Rowe. (Tr. at 514-20) Ballas-Rowe likewise observed in September and October 2010 that Rickabaugh showed better concentration, better motivation, and seemed to be managing his delusions and hallucinations. (Tr. at 484-85) By December 2010, Rickabaugh's hallucinations were controlled although he continued to drink alcohol daily and to have delusions and anxiety. (Tr. at 519)

On January 3, 2011, however, Nurse Martin observed that Rickabaugh had depression, auditory hallucinations, and paranoia. (Tr. at 540) Ballas-Rowe noted the same. (Tr. at 552) On February 2, 2011, Ballas-Rowe completed a mental impairment evaluation form for Rickabaugh, recorded a GAF score of 30, and opined that he was moderately limited in his ability to remember locations, carry out work-like procedures and simple one or two step instructions, interact with the general public, be aware of hazards and take precautions, and travel to unfamiliar places or use public transportation. (Tr. at 525-27) She also opined that Rickabaugh was markedly limited in his ability to understand and remember detailed instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without supervision, work with or near others without being distracted by them, make simple work related decisions, accept criticism and respond appropriately to supervisors, get along with coworkers without distracting them, maintain appropriate social behavior, respond appropriately to changes in the work setting, and set realistic goals or make plans independently. (Tr. at 525-27, 582-83)

In March 2011, Ballas-Rowe observed that despite the ongoing hallucinations and delusions, medication made Rickabaugh calmer and less anxious. (Tr. at 554) Nurse Martin continued treatment with Zyprexa, and in April 2011, although Rickabaugh still exhibited

4

impaired insight and judgment, his hallucinations were controlled and he reported he felt better than he had in a long time. (Tr. at 539)

On April 12, 2011, Nurse Martin completed a mental impairment evaluation for Rickabaugh, diagnosing him with paranoid schizophrenia and assigning him a GAF score of 55. (Tr. at 530) She opined that Rickabaugh was markedly limited in the following: ability to sustain an ordinary routine without supervision, work with or near others without being distracted by them, make simple work-related decisions, complete a normal workweek without psychological symptoms, appropriately interact with the general public, accept criticism and respond appropriately to supervisors, get along with coworkers without distracting them, respond appropriately to changes in the work setting, maintain socially appropriate behavior, be aware of hazards and take precautions, travel to unfamiliar places or use public transportation, and set realistic goals or make plans independently. (Tr. at 533-35) He was moderately limited in: ability to remember locations and work-like procedures, understand and remember detailed instructions, maintain attention and concentration for extended periods, perform within a schedule, maintain punctuality and attendance, and ask simple questions or request assistance. (Tr. at 533-35) Nurse Martin assessed mild limitations in ability to understand, remember, and carry out one or two step or detailed instructions. (Tr. at 533-35)

On May 9, 2011, Nurse Martin continued treatment, noting that Rickabaugh was alert, calm, and cooperative with normal mood, affect, insight, and judgment. (Tr. at 538) In June 2011, however, Nurse Martin observed that Rickabaugh complained of ongoing hallucinations. (Tr. at 559) Ballas-Rowe also noted that Rickabaugh had hallucinations and that they prevented him from working. (Tr. at 556) In July 2011 though, she noted that treatment controlled the

5

hallucinations. (Tr. at 578) By September 2011, Rickabaugh reported to Ballas-Rowe that he was having hallucinations and delusions only once or twice a month. (Tr. at 578)

In March 2012, Rickabaugh reported to Ballas-Rowe that he was depressed, and in April 2012, he reported auditory hallucinations when he missed his treatment. (Tr. at 587, 589) By the next month, however, Rickabaugh's depression and anxiety again improved and he denied having hallucinations. (Tr. at 608)

On May 3, 2012, Nurse Martin and David Kalkstein, M.D., Nurse Martin's supervisor, signed a letter, agreeing with Nurse Martin's April 12, 2011 mental impairment evaluation form. (Tr. at 590-91)

Throughout the rest of 2012, Rickabaugh continued seeing Ballas-Rowe. (Tr. at 608-11, 618-19) In October 2012, she noted that Rickabaugh was less depressed, drinking less alcohol, and showed improved concentration. (Tr. at 616) Still, in November 2012, Ballas-Rowe recorded that Rickabaugh's delusions, hallucinations, paranoia, depression, and anxiety prevented him from working. (Tr. at 617)

From January 2013 to April 2013, Rickabaugh reported to Ballas-Rowe that he continued to experience occasional hallucinations but was mostly stable with his sleep, anxiety, and depression. (Tr. at 620-22) In June 2013, Rickabaugh stopped taking his medications. (Tr. at 623) By November 2013, his psychotic symptoms returned. (Tr. at 624) Ballas-Rowe then referred Rickabaugh to nurse practitioner Ihuoma Chuks. (Tr. at 636)

On November 21, 2013, Rickabaugh established care with Nurse Chuks. (Tr. at 636) She evaluated Rickabaugh and found he had an anxious mood, blunt affect, poor insight, and hallucinations, diagnosing him with schizophrenia. (Tr. at 640-41) She assessed his GAF score

6

at 60 and prescribed Abilify for treatment. (Tr. at 641)

On January 16, 2014, Nurse Chuks noted that Rickabaugh was feeling much better but still occasionally had hallucinations. (Tr. at 633) On January 27, 2014, Ballas-Rowe wrote that Rickabaugh's hallucinations and delusions were under control. (Tr. at 626) Similarly, Nurse Chuks noted the improvement in Rickabaugh (with fewer episodes of hallucinations, until May 2014). (Tr. at 629-32)

In May 2014, Rickabaugh stopped his medication, and Nurse Chuks observed that Rickabaugh again had depression, anxiety, no motivation, paranoia, and hallucinations. (Tr. at 629)

### 2. Medical Source Opinions

#### a. Examining Consultant

Donna Lentine, Ph.D., conducted a consultative mental health evaluation at the request of the Social Security Administration on November 17, 2010. (Tr. at 498) Dr. Lentine noted that Rickabaugh had poor eye contact; irrational thoughts; hallucinations; poor sleep; anxiety; tangential thought process with poor concentration and focus; mild restlessness; feelings of anger and annoyance; negativity; and social isolation. (Tr. at 498-500) She assigned a GAF score of 35 and diagnosed him with paranoid schizophrenia, intermittent explosive disorder, and alcoholism in partial remission. (Tr. at 502) She concluded that Rickabaugh's ability to cope with ordinary work pressure was severely impaired; his ability to relate to others, carry out instructions under ordinary supervision, and sustain performance and attendance in a normal work setting was moderately to severely impaired; and his ability to perform routine, repetitive tasks under ordinary supervision, and understand simple instructions, was moderately impaired.

7

(Tr. at 501-03)

### b. Non-examining Consultants

Carlene Tucker-Okine, Ph.D., reviewed Rickabaugh's file on November 30, 2010. (Tr. at 155) She concluded that Rickabaugh could handle simple, routine tasks in a low social work environment. (Tr. at 155) She concluded that while Rickabaugh was limited in focusing and concentrating on detailed tasks and in interacting with others, he was capable of performing simple instructions and routine work. (Tr. at 154) Dr. Tucker-Okine noted that Rickabaugh presented himself to Dr. Lentine as significantly worse off than progress notes indicated and that Rickabaugh failed to report to Dr. Lentine that medication improved his symptoms. (Tr. at 155)

Christopher King, Psy.D., reviewed Rickabaugh's file on June 30, 2011. (Tr. at 181) He reached the same conclusion as Dr. Tucker-Okine: that Rickabaugh was capable of performing simple, routine tasks in a low social work environment. (Tr. at 181)

### 3. The Administrative Hearings

The ALJ conducted two administrative hearings. (Tr. at 62-63, 104-05) The first took place on July 25, 2012 and included testimony from Rickabaugh and an impartial VE, Mitchell Schmidt. (Tr. at 62) The second hearing, on remand, took place on May 6, 2014, at which Rickabaugh and a different impartial VE, Ennis Harris, testified. (Tr. at 104)

### a. Rickabaugh's Testimony

At the July 2012 hearing, Rickabaugh testified that in July 2010, out of nowhere, he "fell apart inside" while working and became paranoid, anxious, and jumpy. (Tr. at 74) Before that, Rickabaugh did not have any mental health problems. (Tr. at 74) He stated that he was continuing therapy with Ballas-Rowe and receiving treatment from Nurse Martin. (Tr. at 80)

8

However, the medications only helped a little with his racing thoughts and not at all for his hallucinations. (Tr. at 83-84) Rickabaugh testified that he had difficulties in communicating and socializing with others, suicidal thoughts (but never tried harming himself), paranoid thoughts, and trouble sleeping and eating. (Tr. at 81-84) He said he also had problems with his short-term memory and experienced panic attacks a couple times a week. (Tr. at 85)

Rickabaugh testified that he could not return to work because he could not concentrate. (Tr. at 76) Rickabaugh admitted to excessive alcohol consumption but claimed he had stopped drinking two months before the hearing. (Tr. at 77, 79) As to his daily activities, Rickabaugh needed his mother to wake him up but dressed himself, showered, brushed his teeth, cooked, washed the dishes, vacuumed, changed the bed sheets, and shopped for groceries with his mother. (Tr. at 91) Rickabaugh stated he spent most of his days watching television, listening to music, reading books, and occasionally doing some house chores. (Tr. at 94)

At the remand hearing in May 2014, Rickabaugh testified that he was continuing therapy with Ballas-Rowe and had started receiving a different medication from Nurse Chuks. (Tr. at 111-12) However, he felt the medication was ineffective in stopping the hallucinations, although medications he had taken in the past had worked. (Tr. at 113, 122-23) Rickabaugh explained that he was still suffering from the same mental health problems that he testified to in the previous hearing. (Tr. at 116, 120, 122) He now claimed that he had tried to harm himself in 2010, felt irritation at invisible people, and had panic attacks twice a month. (Tr. at 119-20, 122) He also testified that he continued drinking alcohol (about four beers every two weeks) because he enjoyed it and he did not hallucinate when he drank. (Tr. at 114-15, 130) Rickabaugh testified that he gets along with his mother, who he lived with, but otherwise did not participate

9

in social activities with anyone. (Tr. at 118) He stated that his short-term memory was so poor that he had forgotten the directions to the hearing that day. (Tr. at 132)

With respect to daily activities, Rickabaugh described the same capabilities as he had in July 2012, although he added he needed his mother to keep him motivated to do those activities. (Tr. at 124, 131) He still read as a hobby; however, he had difficulty understanding what he was reading. (Tr. at 130)

### b. Vocational Experts' Testimony

VE Mitchell Schmidt ("Schmidt") testified that Rickabaugh's prior work experience included light to heavy, semi-skilled to unskilled work to which he would be unable to return, due to his current RFC, because he would be unable to deal with people. (Tr. at 96-99) Schmidt testified that a hypothetical person of Rickabaugh's onset age, education, work experience, and limitations on contact with coworkers and supervision could still work in some light and/or sedentary jobs. (Tr. at 98-99) For light jobs, Schmidt recommended garment sorter positions (approximately 500 of which are available in Delaware) and housekeeping cleaner positions (2,000 positions in Delaware). (Tr. at 99) For sedentary jobs, Schmidt recommended edible nut sorter positions (250 positions in Delaware) and cuff folder positions (200 positions in Delaware). (Tr. at 99)

On cross-examination by Rickabaugh's attorney, Schmidt testified that if the hypothetical person could not make simple, work-related decisions and complete a normal workweek without interruption, he could not perform the work in the positions Schmidt listed. (Tr. at 101-02)

At the remand hearing, VE Ennis Harris ("Harris") agreed with Schmidt's testimony and assessment of jobs. (Tr. at 134-35) On cross-examination, Harris likewise admitted that if the

10

hypothetical person could not cope with the ordinary pressures of work and/or sustain work performance and attendance (missing more than three days of work a month), the person could not perform competitive employment. (Tr. at 137-40)

## C.  The ALJ's Findings

On August 22, 2012, the ALJ issued the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2.  The claimant has not engaged in substantial gainful activity since July 12, 2010, the alleged onset date (20 C.F.R. 404.1572 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: obesity, mild lumbar spine degenerative disc disease, alcoholism, depression, anxiety, and schizophrenia (20 C.F.R. 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual function capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b), with frequent postural activities, except no climbing of ladders, ropes, or scaffolds. The claimant has to avoid concentrated exposure to hazards. The claimant could perform work that is simple and unskilled, with only occasional contact with coworkers and the general public, work that is essentially isolated, with only occasional supervision, and work that is not at a production pace, meaning paid by the piece or on an assembly line.

6..  The claimant is unable to perform any past relevant work (20 C.F.R. 404.1565 and 416.965).

7.  The claimant was born on August 2, 1977 and was 32 years old,

11

which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. 404. 1563 and 416.963).

8.  The claimant has a limited education and is able to communicate in English (20 C.F.R. 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because under the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* S.S.R. 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 12, 2010, through the date of this decision (20 C.F.R. 404.1520(g) and 416.920(g)).

(Tr. at 42-54)

## III.   LEGAL STANDARDS

### A.   Motion for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10 (1986). A party asserting that a fact cannot be – or, alternatively, is – genuinely disputed must support its assertion either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers,

12

or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586-87; *see also Podobnik v. U.S. Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005) (stating that party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). However, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

13

## B.    Review of the ALJ's Findings

The Court must uphold the Commissioner's factual decisions if they are supported by

"substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Monsour Med. Ctr. v.*

*Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a

preponderance of the evidence but more than a mere scintilla of evidence. *See Rutherford v.*

*Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). As the United States Supreme Court has noted,

substantial evidence "does not mean a large or significant amount of evidence, but rather such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the

Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh

the evidence of record. *See Monsour*, 806 F.2d at 1190-91. The Court's review is limited to the

evidence that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95

(3d Cir. 2001). However, evidence that was not submitted to the ALJ can be considered by the

Appeals Council or the District Court as a basis for remanding the matter to the Commissioner

for further proceedings, pursuant to the sixth sentence of 42 U.S.C. § 405(g). *See Matthews*, 239

F.3d at 592. "Credibility determinations are the province of the ALJ and only should be

disturbed on review if not supported by substantial evidence." *Gonzalez v. Astrue*, 537 F. Supp.

2d 644, 657 (D. Del. 2008) (internal quotation marks omitted).

The Third Circuit has explained that a "single piece of evidence will not satisfy the

substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by

countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence,

14

particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). Thus, the inquiry is not whether the Court would have made the same determination but, rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Even if the reviewing Court would have decided the case differently, it must give deference to the ALJ and affirm the Commissioner's decision if it is supported by substantial evidence. *See Monsour*, 806 F.2d at 1190-91.

## IV.    DISCUSSION

### A.    Disability Determination Process

Title XVI of the Social Security Act provides for the payment of disability benefits to indigent persons under the SSI program. 42 U.S.C. § 1382(a). A "disability" is defined for purposes of SSI as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If a finding of disability or nondisability can be made at any point in

the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(I), 416.920(a)(4)(I) (mandating finding of nondisability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii) (mandating finding of nondisability when claimant's impairments are not severe), 416.920(a)(4)(ii). If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

At step four, the Commissioner determines whether the claimant retains the RFC to perform his past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv) (stating that claimant is not disabled if claimant is able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which [the] individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Halter*, 247 F.3d 34, 40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to her past relevant

16

work." *Plummer*, 186 F.3d at 428.

If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (mandating finding of nondisability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a VE. *See id.*

## B.    Issues Raised on Appeal

On appeal, in seeking reversal or remand, Rickabaugh presses two issues: (1) the ALJ improperly weighed the opinions of treating nurse and physician Nurse Martin and Dr. Kalkstein, treating therapist Ballas-Rowe, examining consultant Dr. Lentine, and non-examining consultants Dr. Tucker-Okine and Dr. King; and (2) the ALJ improperly evaluated Rickabaugh's credibility. (D.I. 13 at 16, 24) The Court concludes that neither argument establishes that Rickabaugh should obtain the relief he seeks.

### 1.    Weight of Medical Opinions

Rickabaugh argues that the ALJ improperly weighed the opinions of Nurse Martin and Dr. Kalkstein, Ballas-Rowe, and Dr. Lentine, as well as the non-examining consultants, Dr.

17

Tucker-Okine and Dr. King. (D.I. 13 at 16) In reviewing the ALJ's analysis, it is not for the Court to re-weigh the medical opinions in the record. *See Gonzalez*, 537 F. Supp. 2d at 659. Rather, the Court must determine whether substantial evidence exists to support the ALJ's weighing of those opinions. *See id.*

In evaluating Rickabaugh's mental condition, the ALJ weighed opinions and medical evidence from Nurse Martin and Dr. Kalkstein, Ballas-Rowe, Dr. Lentine, Nurse Chuks, and the two non-examining consultants. (Tr. 51-53) The ALJ considered findings that Rickabaugh had a normal thought process, intact concentration and memory, fair judgment, and few hallucinations when compliant with medication and contrasted them with findings that Rickabaugh had paranoia, anxiety, poor focus and concentration, and ongoing hallucinations. (Tr. 47-53)

### a. Nurse Practitioner Martin and Dr. Kalkstein

As a nurse practitioner, Nurse Martin is not an "acceptable medical source" that can "establish . . . a medically determinable impairment." 20 C.F.R. §§ 404.1513(a). However, evidence from nurse practitioners may be used to show "the severity of [an] impairment[ ] and how it affects [a claimant's] ability to work." 20 C.F.R. § 404.1513(d). In evaluating such evidence, factors to be considered include how long the practitioner has known the claimant and how frequently the practitioner has seen the claimant; how consistent the opinion is with other evidence; the degree to which the claimant presents relevant evidence to support an opinion; how well the source explains the opinion; whether the source has a specialty related to the individual's impairments; and any other factors that support or refute the opinion. *See* 20 C.F.R. § 404.1527(c); *Roache v. Colvin*, 170 F. Supp. 3d 655, 672 (D. Del. 2016).

First, Rickabaugh contends that the ALJ should have considered Nurse Martin's opinion

18

as a treating physician's opinion because Nurse Martin and Dr. Kalkstein co-signed the opinion and Dr. Kalkstein is an acceptable medical source. (D.I. 13 at 17) When a treating source's opinion on the severity and nature of the impairment "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record," it should be given controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If the record contains conflicting evidence, "the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reason." *Plummer*, 186 F.3d at 429 (internal quotation marks omitted). The ALJ may reject a treating source's opinion when there is contradictory medical evidence but cannot base rejection on "his or her own credibility judgments, speculation or lay opinion." *Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000). Courts in the Third Circuit have considered the opinions of treating sources that are not acceptable medical sources to be the opinions of treating physicians when the opinion is given in tandem to the treating physician's. *See, e.g.*, *Esposito v. Colvin*, 2015 WL 867887, at *9 (W.D. Pa. Feb. 27, 2015); *Knaub v. Astrue*, 2009 WL 89435, at *12 (M.D. Pa. Jan. 13, 2009). Here, Rickabaugh points out that Nurse Martin's supervising physician co-signed the opinion with her. (D.I. 13 at 17) However, the ALJ's decision not to view the relationship between Rickabaugh and Dr. Kalkstein like that which is existed in *Knaub* – where the physician was an active part of the claimant's treatment (he treated the claimant for seven years, sat in on therapy sessions, and spoke to him before and after sessions) – is well-grounded in the record, as the facts presented there were quite different. *See Knaub*, 2009 WL 89435, at *12. The Court finds no error in the ALJ's decisions not to treat Dr. Kalkstein as a treating physician and not to extend treating physician status to Nurse Martin's opinion.

Second, Rickabaugh contends that the ALJ gave too little weight to Dr. Kalkstein's opinion and Nurse Martin's opinion. (D.I. 13 at 16) For similar reasons as stated above, the ALJ did not have to give controlling weight to Dr. Kalkstein's opinion, as there was no indication that he was a treating physician who had an ongoing treatment relationship with Rickabaugh. Even if the ALJ should have considered Dr. Kalkstein as a treating physician, the ALJ properly afforded Dr. Kalkstein's opinion limited weight based on substantial evidence that it was inconsistent with the record as a whole. (Tr. at 52) Dr. Kalkstein, in his evaluation with Nurse Martin, wrote that Rickabaugh had limited social function, concentration, and mental functioning; in contrast, Nurse Martin's treatment notes stated that Rickbaugh's concentration and judgment improved to average when he was on medication. (Tr. at 448, 590) Additionally, Dr. Kalkstein's opinion conflicted with Nurse Martin's assessment of Rickabaugh's GAF scores of 60 and 55, which indicated mild to moderate symptoms. (Tr. at 455, 530) The ALJ also gave limited weight to Nurse Martin's opinion because it was inconsistent with the record, which included Nurse Martin's own treatment notes. (Tr. at 52)

Rickabaugh contends that Nurse Martin and Dr. Kalkstein's opinion is not inconsistent with the record because observations that Rickabaugh was stable with medication do not contradict the physician's determination that Rickabaugh was disabled. (D.I. 13 at 19) To support his argument, Rickabaugh points out that courts have recognized that someone who responds to treatment is not necessarily one who is able to work. *See Scott v. Astrue*, 647 F.3d 734, 739-40 (7th Cir. 2011); *Morales*, 225 F.3d at 319. However, in the cases Rickabaugh cites, the claimant showed some improvement but still had frequent and severe symptoms. *See Scott*, 647 F.3d at 740 (responding well to treatment was not inconsistent with physician's opinion that

20

claimant was unable to work when claimant continued to experience frequent bouts of crying and paranoia due to her bipolar disorder). When there is substantial evidence of improvement in the claimant's condition showing that he is able to work, opinions from physicians about the individual's inability to work may be inconsistent with the record. *See Torres v. Barnhart*, 139 F. App'x 411, 414-15 (3d Cir. 2005) (limiting physician's opinion because it was inconsistent with record showing substantial evidence that claimant experienced dramatic, continuous improvement in levels of social functioning and decrease in psychotic symptoms after taking medication); *Drejka v. Comm'r of Soc. Sec.*, 61 F. App'x 778, 782 (3d Cir. 2003). Here, throughout Rickabaugh's treatment notes with Nurse Martin, Ballas-Rowe, and Nurse Chuks, Rickabaugh showed constant improvement in his mood, insight, judgment, concentration, and motivation when medicated. (Tr. at 448, 484-85, 538-39, 554, 608, 616, 620-22, 633) Even though Rickabaugh continued to have hallucinations, the treatment notes indicate that his hallucinations consistently decreased in frequency while on medication and reduced to occurring only a few times a month. (Tr. at 448, 484-85, 519, 539, 578, 608, 620-22, 626, 629-33) There is substantial evidence in the record from which the ALJ could conclude that Rickabaugh had substantial improvement in his mental functioning when complaint with his medication and that, because of that improvement, Nurse Martin and Dr. Kalkstein's opinion was inconsistent with the record.

Rickabaugh also contends that Nurse Martin and Dr. Kalkstein's opinion is consistent with the record based on his GAF scores. (D.I. 13 at 19) Even so, the ALJ did not rely exclusively on GAF scores when she decided to give limited weight to Nurse Martin and Dr. Kalkstein's opinion. (Tr. at 479, 522) As discussed above, the ALJ considered the totality of the

21

evidence, including all GAF scores, the non-examining consultants' opinions, and the treatment notes showing improvement in Rickabaugh's condition, to determine the weight given to Nurse Martin and Dr. Kalkstein's opinion.

Therefore, the Court finds that substantial evidence supports the ALJ's determination to give little weight to Nurse Martin and Dr. Kalkstein's opinion.

### b. Ballas-Rowe

As a licensed clinical social worker, Ballas-Rowe is not an acceptable medical source. *See* 20 C.F.R. § 404.1513(a). Her opinion is entitled to consideration however, *see* 20 C.F.R. §§ 404.1513(d), 416.913(d), and the ALJ accepted her opinion – but chose to give it little weight because it was inconsistent with substantial evidence in the record showing that Rickabaugh's condition significantly improved when he was complaint with his medication. (Tr. at 52) Rickabaugh argues that the ALJ was incorrect for the same reasons he gave with respect to Nurse Martin and Dr. Kalkstein's opinion. (D.I. 13 at 22) However, as Ballas-Rowe herself – as well as Nurse Martin and Nurse Chuks – noted marked improvements in Rickabaugh's mental condition when he was on medication, the ALJ had substantial evidence to find that Ballas-Rowe's opinion that Rickabaugh had marked limitations in most areas of mental functioning was inconsistent with the record as a whole. (Tr. at 448, 484-52, 518-21, 525-27, 538-39, 554, 558-60, 578-79, 608, 616, 618, 620-22, 626, 629-33)

### c. Examining Consultant, Dr. Lentine

Rickabaugh argues that the ALJ gave too little weight to Dr. Lentine's opinion. (D.I. 13 at 22) The ALJ found that Dr. Lentine's opinion was entitled to little weight because it was inconsistent with and unsupported by the record. (Tr. at 51-52)

22

Social Security regulations provide that "the opinions of State agency medical . . . consultants and other program physicians . . . can be given weight only insofar as they are supported by evidence in the case record," including "the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the State agency medical . . . consultant or other program physician." S.S.R. 96–6p, 1996 WL 374180, at *2 (July 2, 1996).

Rickabaugh contends that Dr. Lentine's opinion is not inconsistent with the record for the same reasons as he did with respect to Nurse Martin and Dr. Kalkstein's opinion. (D.I. 13 at 22) For the same reasons given above, the Court concludes there is substantial evidence to support the ALJ's decision with respect to Dr. Lentine's opinion.

### d. Non-examining Consultants, Dr. Tucker-Okine and Dr. King

The ALJ gave significant weight to the opinions of the two non-examining consultants, Dr. Tucker-Okine and Dr. King. (Tr. at 53) Generally, opinions from non-examining sources are not entitled to significant weight when contradicted by well-supported opinions from treating physicians. *See* 20 C.F.R. §404.1527(c); *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 357 (3d Cir. 2008). Here, the ALJ had substantial evidence, based on the treatment notes from Nurse Martin, Ballas-Rowe, and Nurse Chucks, from which to conclude that the opinions of the treating sources were not well-supported and were inconsistent with the record. Hence, the ALJ was free to give greater weight to the non-examining consultants, whose opinions were consistent with the record.

Rickabaugh argues that the weight placed on Dr. Tucker-Okine's and Dr. King's opinions was unwarranted, as they reviewed his file on November 30, 2010 and June 30, 2011,

23

respectively, which was three years prior to the ALJ's decision on August 8, 2014. (D.I. 13 at 21) After their review, Rickabaugh had further treatment notes as well as the opinion Dr. Kalkstein signed with Nurse Martin. Because "the Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it," whether the time lapse matters depends on whether the ALJ believes that intervening evidence would have changed the consultant's findings. *See Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). Here, the ALJ found the additional medical records following Dr. King's review of the record to be consistent with the previous medical records. (Tr. at 53) Additionally, Dr. Kalkstein's opinion was the same as the previous opinions Nurse Martin had given, directly referring to Nurse Martin's evaluation on April 12, 2011, so it was unlikely to affect Dr. Tucker-Okine's or Dr. King's opinions. (Tr. at 590-91)

Therefore, substantial evidence supports the ALJ's decision to give significant weight to the non-examining consultants' opinions.

## 2. Rickabaugh's Credibility

Rickabaugh next contends that the ALJ failed to evaluate the credibility of his testimony properly. (D.I. 13 at 23) Specifically, Rickabaugh argues that the ALJ provided a conclusory finding that his testimony was "not entirely credible." (*Id.* at 24) The Commissioner contends that the ALJ provided specific reasons for her credibility determination, mainly that she found Rickabaugh's testimony to be inconsistent. (D.I. 15 at 15-16)

An ALJ's credibility determination is entitled to deference and should not be discarded lightly, particularly given the ALJ's opportunity to observe an individual's demeanor. *See Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003). The ALJ must, however, explain her reasons for

24

the credibility determination. *See Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 122 (3d Cir. 2000). When there are inconsistencies in a claimant's testimony or daily activities, the ALJ may conclude that some or all of the claimant's testimony is not fully credible. *See Burns v. Barnhart*, 312 F.3d 113, 130 (3d Cir. 2002). A claimant's allegations of pain or other subjective symptoms must be supported by objective medical evidence. *See* 20 C.F.R. § 404.1529; *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999).

Here, the ALJ found that Rickabaugh's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but that "[Rickabaugh's] statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely credible." (Tr. at 46) As part of her findings, the ALJ then discussed Rickabaugh's medical records as well as her observations during hearing. (Tr. at 47-51) The ALJ's reasons for her credibility assessment may, as here, be sufficiently clear based on her discussion of the medical evidence in the record. *See Pistor v. Thompson*, 258 F. App'x 452, 454 (3d Cir. 2007).

There is no basis in the record to conclude, despite Rickabaugh's contentions, that the ALJ based her credibility determination solely on her lay observation of Rickabaugh at the hearing. (D.I. 13 at 25) The ALJ noted that, at the hearing, Rickabaugh claimed that his medication (Abilify) did not work but then cited Nurse Chuk's treatment notes indicating that the medication reduced Rickabaugh's hallucinations. (Tr. at 46, 51) The ALJ also referred to Rickabaugh's testimony that he had several other symptoms like anxiety, depression, racing thoughts, irritated mood, panic attacks, and difficulties eating and sleeping. (Tr. at 46) However, the ALJ then detailed Rickabaugh's medical records, the totality of which indicated that those symptoms improved with medication. (Tr. at 47-51) In sum, the ALJ adequately explained her

25

credibility determination and there is substantial evidence to support her findings.

## V.     CONCLUSION

Given the substantial evidence that supports the ALJ's weighing of the medical opinions and credibility determination, the will deny Plaintiff's motion for summary judgment and grant Defendant's motion for summary judgment. An appropriate Order follows.